PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PROVIDENT LIFE & ACCIDENT
INSURANCE COMPANY,
　　　　　　　　*Plaintiff-Appellee,*

v.　　　　　　　　　　　　　　　　　　　No. 04-1270

MELVYN COHEN,
　　　　　　　*Defendant-Appellant.*

PROVIDENT LIFE & ACCIDENT
INSURANCE COMPANY,
　　　　　　　　*Plaintiff-Appellant,*

v.　　　　　　　　　　　　　　　　　　　No. 04-1386

MELVYN COHEN,
　　　　　　　*Defendant-Appellee.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-99-2517-CCB)

Argued: March 18, 2005

Decided: August 29, 2005

Before WILKINS, Chief Judge, and WIDENER and TRAXLER,
Circuit Judges.

Affirmed in part and reversed in part by published opinion. Judge
Traxler wrote the opinion, in which Chief Judge Wilkins and Judge
Widener Joined.

**COUNSEL**

**ARGUED:** William Parry Dale, MCCHESNEY & DALE, P.C., Bowie, Maryland, for Appellant/Cross-Appellee, Melvyn Cohen. Michael Robert McCann, FUNK & BOLTON, P.A., Baltimore, Maryland, for Appellee/Cross-Appellant, Provident Life & Accident Insurance Company. **ON BRIEF:** Derek B. Yarmis, FUNK & BOL-TON, P.A., Baltimore, Maryland, for Appellee/Cross-Appellant, Provident Life & Accident Insurance Company.

**OPINION**

TRAXLER, Circuit Judge:

Provident Life & Accident Insurance Company (Provident) brought this suit against Melvyn Cohen under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.A. § 1101 *et seq.* (West 1999 & Supp. 2004), seeking recovery of the "total disability" benefits paid to Cohen under a disability income policy (the Policy) and requesting that the district court declare the Policy null and void. Cohen counterclaimed, seeking reinstatement of benefits. After a bench trial, the district court denied Cohen's counterclaim, denied Provident's claim seeking recovery of the benefits paid to Cohen, and granted Provident's request for declaratory relief. Cohen then filed a motion to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, asking that the district court address Cohen's entitlement to "residual disability" benefits under the Policy. The district court denied Cohen's motion.

Cohen appeals from both rulings and raises three issues. Cohen first claims that he satisfies the definition of "totally disabled" under the Policy and is entitled to reinstatement of his benefits. Cohen next argues that, if he is not totally disabled, then he is "residually disabled" under the Policy. Finally, Cohen maintains that the district court should not have declared the Policy null and void. Provident cross-appeals, arguing that the district court should have awarded it a recovery of the benefits paid to Cohen under the Policy. We affirm in part and reverse in part.

I.

After a nine-day bench trial, the district court made the following findings of fact. Cohen was the president and head salesperson at Colonial Distributors (Colonial), a business that sold and distributed cabinets and countertops for kitchens and baths. With approximately 30 years of experience in this business in the greater Washington, D.C. metropolitan area, Cohen had developed a large network of business contacts which allowed him to succeed in this line of work. Cohen worked primarily on "ship and bill direct" jobs for new apartments or hotels. Ship and bill direct means that the makers of the cabinets or countertops ship the product directly to the construction site, where the contractor is responsible for unloading and installing the cabinets and countertops.

A typical job for Cohen involved the following tasks: learning about a construction project from publicly available sources or from contacts in the construction industry, obtaining the blueprint for the construction project, drawing the styles of kitchen or bathroom cabinets or countertops needed for the project, obtaining price information from manufacturers, and bidding for the project. If Cohen's bid was accepted, then he also attended weekly meetings at the job site to track the construction progress; measured the kitchens and bathrooms in advance of the delivery date so that, if necessary, the manufacturer could modify the product before the delivery deadline; and finally, arranged for the product's arrival in time to permit the contractor to unload and install the product. Successful completion of these tasks involved considerable attention to detail, and Cohen normally worked on several projects at once. As president and head salesman of Colonial, Cohen also handled the firing and hiring of employees, worked on accounts receivable, and trained new salespeople.

After suffering a heart attack in November 1995, Cohen, on the advice of his physician, spent time recuperating, assisting in the completion of numerous projects at Colonial, and closing the sale of his business interest in Colonial in June 1997. Cohen also applied for and received total disability benefits from Provident under the Policy. From March 1996 through June 1999, Cohen received approximately $238,000 in total disability benefits. Provident terminated Cohen's benefits on June 21, 1999, however, because an investigation revealed

that Cohen's medical condition had improved and that Cohen was engaging in his prior occupational activities, despite statements he made to the contrary on his monthly supplemental statement of claim forms.

Specifically, Provident demonstrated at trial that, in July 1997, Cohen began working without compensation for his sons' new kitchen and bath business named Montgomery Kitchen and Bath ("MKB"), and recruited a salesperson from Colonial, Robert Cutler, to join MKB. Cohen worked the pricing part of the ship and bill direct jobs, and Cutler completed the field work. This arrangement increased the volume of work that MKB could manage, and several of Colonial's large customers switched suppliers in 1997 when MKB opened for business.

In his work for MKB, Cohen handled the stress of meeting deadlines and dealing with customers, trained his sons in the business, and supervised Cutler's work. Cohen also held himself out as being in charge of MKB's business. For example, Kevin MacClary of Fougler-Pratt Contracting, for whom MKB did several projects during 1997-1999, testified that he dealt almost exclusively with Cohen, believed Cohen was "the principal" at MKB, and, if there were any problems with the project, turned to Cohen for assistance. J.A. 662-63.

Finally, the medical evidence revealed that Cohen's physical capacity had substantially improved since his heart attack. In January 1997, Cohen was able to engage in physical activity requiring an oxygen intake of nine metabolic equivalents ("METs"). In February 2000, Cohen exercised at a level of ten METs.[1]

Despite all this work activity, Cohen submitted a supplemental statement of claim form to Provident every month from the time MKB began its business. When asked what activities he engaged in, Cohen responded that he was exercising, participating in a cardiovascular treatment program, and doing chores and volunteer work. These supplemental statement of claim forms also requested that Cohen

---

[1]METs measure the amount of oxygen that a person can take into his or her system while exercising. By way of example, a person who can exercise at 10.2 METs has the ability to jog a ten-minute mile.

describe which of the duties of his former position he was unable to do. Every month, Cohen replied, "all duties." J.A. 3507-52.

Based on this evidence, the district court denied Cohen's counter-claim for reinstatement of his benefits, ruling that Cohen was not totally disabled as defined by the Policy. The Court also denied Provident's federal common law unjust enrichment claim, reasoning that such claim failed under our decision in *Provident Life & Accident Insurance Co. v. Waller*, 906 F.2d 985 (4th Cir. 1990), and was inconsistent with the Supreme Court's decision in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002). The district court granted Provident's request for declaratory relief, however, declaring the Policy null and void under 29 U.S.C.A. § 1132(a)(3)(B) (West 1999). The district court found the relief sought "equitable in nature" and appropriate due to the intentionally misleading statements Cohen made on his monthly supplemental statement of claim forms. Finally, the district court denied Cohen's motion for reconsideration, which asked the court to determine whether he was eligible for residual disability benefits. The district court held that Cohen's request was barred because the Policy had been declared null and void.

## II.

The district court's conclusions of law are reviewed *de novo*, and its factual findings are reviewed under the clearly erroneous standard. *See Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 223 (4th Cir. 1998). A factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). We may not reverse the district court's findings simply because we would have decided the case differently. *See Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573-74.

III.

A.

Cohen first argues that he satisfies the definition of totally disabled under the Policy and is entitled to reinstatement of benefits.

The Policy provides, in pertinent part,

> Total Disability or totally disabled means that due to Injuries or Sickness:
>
> 1. *you are not able to engage in your occupation*; and
>
> 2. you are receiving care by a Physician which is appropriate for the condition causing the disability.
>
> [Y]our occupation means the occupation . . . in which you are regularly engaged at the time you become disabled.

J.A. 3462 (emphasis added).

In concluding that Cohen was not totally disabled when Provident terminated his benefits in June 1999, the district court examined whether Cohen was able to "engage in his own occupation" at that time.[2] J.A. 165-66. To determine whether Cohen could engage in his occupation, the district court followed the analysis set forth by the Seventh Circuit in *McFarland v. General American Life Insurance Co.*, 149 F.3d 583 (7th Cir. 1998). In *McFarland*, the Seventh Circuit recog-

---

[2]The district court misquoted the Policy in one portion of its decision, stating that total disability means that "[y]ou are not able to perform the substantial and material duties of your occupation." J.A. 163. In addition, the district court attempted to determine the meaning of total disability in relation to another policy provision providing for residual disability coverage. The Policy clearly states, however, that "[n]othing in this [residual disability coverage] provision limits the policy definition of 'Total Disability.'" J.A. 1406. Because the district court ultimately applied the appropriate standard to determine whether Cohen was totally disabled, these errors are harmless.

nized two types of reductions in work performance that could prevent a person from being able to engage in his or her occupation: qualitative and quantitative reductions. *Id.* at 588.

Qualitatively, the district court examined whether there was *any* essential function of Cohen's job at Colonial that he could not perform in 1999. In this respect, the district court noted that Cohen was able to generate business through his contacts, price and bill projects, train and supervise employees, handle the stress of tight deadlines, respond to customer concerns, and complete a substantial amount of field work. The district court, therefore, concluded that Cohen was not, in any qualitative way, totally disabled under the Policy.

Quantitatively, the district court considered whether the amount of work Cohen could complete had been reduced in any significant manner. To this end, the district court recognized Cohen's need to reduce the stress in his life and the number of hours he previously worked at Colonial. Nonetheless, the district court concluded that these needs did not curtail Cohen's ability to work to such a degree that "he could no longer engage in his own occupation." J.A. at 166.

On appeal, Cohen argues that the district court's application of the standard set forth in *McFarland* to the facts of this case was in error. Cohen first suggests that other definitions of total disability provide better guidance as to whether he was totally disabled. Cohen claims a person is totally disabled when he is unable to perform his "regular occupation," which Cohen suggests means the "usual work that the insured is actually performing immediately before the onset of the disability." Brief of Appellant at 19 (internal quotation marks omitted). Cohen alternatively submits that the Policy requires a court to examine the insured's occupation and identify the important duties the insured actually performed before the disabling event and then consider whether the insured could continue to perform those important duties after the disabling event in the usual and customary way.

These alternative definitions of the term total disability do not compel a different result in this case. At least one of the definitions urged by Cohen follows precisely the same analysis applied by the district court. That is, the district court's decision first identified what Cohen's occupation was at Colonial before his heart attack, detailing

the important duties Cohen actually performed in his position there. Then, the district court outlined how, in 1999, when Provident terminated Cohen's benefits, Cohen could perform all the important and essential duties of his job at Colonial (i.e., the qualitative analysis), and that Cohen could perform these duties to a degree consistent with his pre-disability work efforts (i.e., the quantitative analysis). Setting aside any difference in verbiage, moreover, we find that the district court's analysis is no different from a determination that, in 1999, Cohen could perform the important duties of his previous job at Colonial in the usual and customary way. Cohen's argument, therefore, urging us to apply other definitions of the term totally disabled, is unavailing.

Cohen next argues that, in viewing the evidence as a whole, the district court should have concluded that he was totally disabled. Specifically, Cohen directs us to evidence demonstrating that, while working for Colonial, he usually worked sixty to seventy hours a week, spent eighty to ninety percent of his time in the field on projects sometimes involving high-rise apartment buildings in excess of fourteen stories, and while not in the field, spent his time "worry[ing] about everything," "putting out fires," "trying to keep customers and suppliers happy," and "deal[ing] with Colonial's sales and administrative staff." J.A. 2495. After his heart attack, however, Cohen maintains that the work he performed for MKB was not so substantial, but, rather, "incidental, non-continuous and highly infrequent." Brief of Appellant at 41. Cohen points to evidence showing that he never received a salary for the work he completed for MKB; that he had no MKB ownership interest, office, title, or business cards; that his work for MKB involved only the bid process, but no field work; that his work involved no deadlines or stress; and that his doctor advised him never to return to work.

We find this evidence to be of no assistance to Cohen. Cohen's decision to forego compensation or any MKB ownership interest, office, or title is irrelevant to determining whether he can engage in his occupation. Evidence of this nature has no bearing on whether Cohen can perform the important duties of his job in the usual and customary way.

Similarly, even if Cohen's work for MKB fell short of his sixty-to seventy-hour work week at Colonial, Cohen failed to establish that

working this number of hours a week was necessary to perform an important duty of his occupation in the usual and customary way. Indeed, ample evidence supports the district court's conclusion that "Cohen's ability to work had not fallen so low as of 1999 that he could no longer engage in his own occupation." J.A. 166. Cohen at the very least implied so himself when he stated at trial: "I cut way, way back because of Provident['s]" investigation in 1999. J.A. 162.

Likewise, evidence that Cohen only priced the projects and delegated the field work to Cutler at MKB fails to establish that Cohen could not actually perform the field work himself. After reviewing the medical evidence, the district court determined that Cohen could perform a substantial amount of field work required by his job, given that the majority of Cohen's projects at MKB involved one- to four-story garden apartments, not high rise apartments that would require Cohen to climb several flights of stairs or tolerate extreme environmental circumstances. There is nothing within the record to show that the district court's findings of fact in this respect are clearly erroneous.

With regard to the work pressures at MKB, Cohen's testimony that his work involved no deadlines or stress was discounted by the district court in light of the "grossly misleading" statements Cohen made regarding his disability on his monthly supplemental statement of claim forms. J.A. 162. Further, the testimony and documentary evidence submitted at trial easily lends itself to the district court's determination that, in his work for MKB, Cohen regularly handled the stress of meeting project deadlines and addressing customer complaints. We, therefore, do not find any clear error here either.

Finally, the district court substantially discounted the value of the opinion of Cohen's doctor that Cohen should never return to his previous occupation. The district court found this opinion contradictory to the medical records and testimony showing that Cohen's overall health and objective ability to function improved significantly from 1996 forward. The district court also noted that Cohen's doctor had not observed Cohen in his work for MKB. Cohen has failed to present any argument or evidence demonstrating that the district court's balance of evidence in this instance was clearly erroneous.

For the reasons discussed above, we agree with the district court that Cohen is not entitled to reinstatement of his total disability benefits under the Policy.

## B.

Next, Cohen contends that he is entitled to "residual disability" benefits under the Policy. The district court denied Cohen's request for residual disability benefits finding that, because the Policy terminated for nonpayment of the premiums, any award of residual disability benefits was barred.

Cohen argues that the district court "put the cart before the horse," in ruling that the Policy lapsed for nonpayment of premiums, without first addressing whether Cohen was residually disabled. Brief of Appellant at 43. Cohen explains that if he was residually disabled, then the Policy waived any premiums due and it could not have lapsed for nonpayment of premiums.

Assuming that the district court should have addressed Cohen's eligibility for residual disability benefits under the Policy before declaring the Policy to have lapsed for nonpayment of premiums, we affirm the district court's decision to deny Cohen residual disability benefits. Under the Policy's definition, Cohen is not residually disabled. The Policy provides:

> Residual Disability or residually disabled, during the Elimination Period, means that due to Injuries or Sickness:
>
> 1. you are not able to do one or more of your substantial and material daily business duties but you are able to do at least one of said substantial and material daily business duties, or, you are not able to do your usual daily business duties on a full time basis;
>
> 2. you have a Loss of Monthly Income in your occupation of at least 20%; and
>
> 3. you are receiving care by a Physician which is appropriate for the condition causing disability.

After the Elimination Period has been satisfied, you are no longer required to have a loss of duties or time. Residual Disability or residually disabled then means that as a result of the same Injuries or Sickness:

1. you have a Loss of Monthly Income in your occupation of at least 20%; and

2. you are receiving care by a Physician which is appropriate for the condition causing the Loss of Monthly Income.

J.A. 1406. The Policy further explains that "Loss of Monthly Income must be caused by the Residual Disability for which [the] claim is made." *Id.*

Pursuant to these terms, Cohen must demonstrate that, either before or after the Elimination Period and as a result of his injuries or sickness, he has incurred at least a twenty-percent loss of monthly income in his occupation. The evidence in the record cannot sustain such a finding. At least since June 1999, when Provident terminated Cohen's benefits, Cohen has been able to engage in his occupation. The district court found only that Cohen remained unable to "work excessively long hours and do field work in the minority of job sites where the environmental conditions were extreme and the stairs were particularly difficult to ascend." J.A. 165. Nothing in the record suggests that Cohen's inability to work in these few instances would prevent him from earning at least eighty percent of what he previously earned in his occupation.

Cohen emphasizes that he has not received any compensation since his heart attack. The record, however, demonstrates that Cohen voluntarily chose not to receive any compensation for his work at MKB. The record does not reveal any evidence that, *because* of his disability, Cohen cannot earn at least eighty percent of what he used to earn in his occupation. Because the record fails to demonstrate that Cohen satisfies the Policy's definition of residually disabled, we affirm the district court's decision to deny Cohen residual disability benefits.

## C.

Finally, Cohen appeals the district court's decision to grant Provident declaratory relief pursuant to § 1132(a)(3) of ERISA. Section 1132(a)(3) authorizes a fiduciary to bring a civil action:

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C.A. § 1132(a)(3)(B). The district court held that the relief sought was "equitable in nature" and warranted due to the materially misleading statements Cohen made on his monthly supplemental statement of claim forms. The district court explained that Cohen's intentionally misleading statements amounted to a material breach of the Policy, which required beneficiaries to submit "satisfactory proof" of disability in order to waive premiums and receive benefits. The court therefore granted Provident's request for declaratory relief and declared the Policy null and void, thus relieving Provident of any further obligations to Cohen. Cohen claims that this relief is not authorized by ERISA. We agree.

As noted above, ERISA authorizes fiduciaries to bring actions to obtain equitable relief to enforce, or redress a violation of, the terms of the plan or the requirements of ERISA. *See* 29 U.S.C.A. § 1132(a)(3)(B). Courts have long held that an insurer who was fraudulently induced into issuing a policy of insurance may bring an action in equity for rescission of the policy. *See, e.g.*, *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 212 (1937); *Provident Life & Acc. Ins. Co. v. Sharpless*, 364 F.3d 634, 639-40 (5th Cir. 2004); *Jefferson Standard Life Ins. Co. v. Keeton*, 292 F. 53, 54-56 (4th Cir. 1923).

This case, however, does not involve fraudulent *inducement*. That is, there is no suggestion that Cohen lied about his health when applying for coverage and thus induced Provident to issue a policy that it otherwise would not have issued. Instead, Provident's claim is based on conduct occurring well after the issuance of the policy. While it could perhaps be said that Cohen's misrepresentations about the state

of his health after the heart attack fraudulently induced Provident to *continue* providing disability benefits, that is a far cry from a typical fraudulent inducement claim that sounds in equity.

For purposes of this opinion, however, we will assume Provident's claim seeking rescission of the Policy is a claim for equitable relief under § 1132(a)(3)(B). But section 1132(a)(3)(B) only authorizes actions seeking *appropriate* equitable relief. In our view, the relief sought by Provident is not appropriate and thus is not available under ERISA.

While we do not diminish the seriousness of Cohen's misconduct, we do not believe that the misconduct warrants the voiding, *ab initio*, of the Policy. As mentioned above, Cohen did not mislead Provident into issuing a policy it otherwise would not have issued, and the parties for years lived up to their obligations under the Policy. The Policy includes coverage for residual disability even in the absence of total disability. While Cohen's misrepresentations about the length of time that he was totally disabled would have nothing to do with whether he is residually disabled under the Policy, voiding the Policy deprives Cohen of any possibility of residual disability benefits, all because of unrelated misconduct.[3] Under these circumstances, we believe that to void the Policy would be unduly punitive and therefore not appropriate equitable relief within the meaning of § 1132(a)(3)(B). *See Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 385 (4th Cir. 2001) ("[E]ven if the redress sought by a beneficiary under ERISA § 502(a)(3) is a classic form of equitable relief, it must be *appropriate* under the circumstances.").

## IV.

Provident cross-appealed, arguing that the district court should have permitted Provident to recover the total disability benefits paid to Cohen pursuant to a federal common law unjust enrichment claim.

---

[3]We have, of course, already concluded that Cohen failed to present evidence demonstrating that he was residually disabled within the meaning of the Policy. We express no opinion as to whether, consistent with the terms of the Policy, Cohen could in the future make a claim for benefits.

Provident contends that its claim is permitted under this court's deci-sion in *Provident Life & Accident Insurance Co. v. Waller*, 906 F.2d 985 (4th Cir. 1990). We reject Provident's arguments for the follow-ing reasons.

First, the justification for the court's recognition of a federal com-mon law unjust enrichment claim in *Waller* is in serious doubt, as it is no longer debatable that Provident has an "explicit remedy" under § 1132(a)(3). In *Waller*, an administrator sued to recover funds advanced under an ERISA plan to an insured as compensation for injuries caused by a third party. The plan in *Waller* required the insured to reimburse it, in the event the insured recovered compensa-tion from the at-fault party. After recovering a compensatory award from the at-fault party, the insured refused to repay the plan.

Before examining whether it was appropriate to recognize a federal common law claim of unjust enrichment, the court in *Waller* deter-mined that "ERISA does not provide an explicit remedy for [the insurance company]." *Waller*, 906 F.2d at 990. At the same time, however, the *Waller* court noted that "[i]t is probable . . . [the admin-istrator] could have sued under § 1132(a)(3)," 906 F.2d at 988 n.5, authorizing a "fiduciary" to bring a civil action against a beneficiary "to obtain . . . appropriate equitable relief." 29 U.S.C. § 1132(a)(3)(B).

At the time *Waller* came before the court on appeal, whether a plan administrator was a fiduciary under § 1132(a)(3) was somewhat unclear. For example, the court stated:

> Although . . . § 1132(a)(3)[ ] may also provide a route to
> federal jurisdiction, there is seemingly little or no authority
> with regard to that question. Accordingly, in this case, we
> prefer to ground federal jurisdiction under the federal ques-
> tion provision.

906 F.2d at 988 n.6; *see also id.* at 988 n.5 (noting that the court only decided that a plan administrator "'is clearly a fiduciary'" four days before the parties orally argued the issues presented in *Waller*) (quot-ing *U.S. Steel Mining Co. v. Dist. 17, United Mine Workers of Am.*, 897 F.3d 149, 152 (4th Cir. 1990)).

It is now evident that Provident, as the benefit plan administrator, is a fiduciary with the right to bring a civil action under § 1132(a)(3). *See Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 379 (4th Cir. 2001) (noting that entity acts as "a fiduciary for purposes of ERISA when it is engaged in the administration or management of its pension plan"). We, therefore, seriously question whether *Waller*'s recognition of a federal common law unjust enrichment claim remains viable. *See Coop. Ben. Adm'rs, Inc. v. Ogden*, 367 F.3d 323, 334 (5th Cir. 2004) (rejecting *Waller*, as having failed to "consider[ ] the applicability of § 502(a)(3) to the plan administrator's claim prior to granting the administrator a federal common law remedy"); *Pacificare Inc. v. Martin*, 34 F.3d 834, 836 (9th Cir. 1994) (refusing to recognize federal common law *cause of action* under ERISA). *Cf. Rego v. Westvaco Corp.*, 319 F.3d 140, 149 (4th Cir. 2003) (finding *Waller* inapplicable because plaintiff had explicit remedy, albeit meritless, under ERISA).

Second, we find it particularly inappropriate to afford Provident a federal common law remedy where Congress purposefully chose to exclude such a remedy under the governing statute. ERISA provides nine civil enforcement provisions, which specifically identify who may bring suit and what relief is available under benefit plans subject to the statute. The Supreme Court has explained that these provisions constitute an "interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a 'comprehensive and reticulated statute.'" *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)). As a result, it is well-established that state law actions, for example, to enforce the contractual terms of an ERISA plan, are preempted by the federal statutory scheme. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987) ("The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive.")

Similarly, although the Supreme Court has approved of the development of a federal common law under ERISA, *see id.* at 56, the Court has carefully admonished that, in so doing, courts may not create remedies under the federal common law beyond those Con-

gress has seen fit to enact. *See Russell*, 473 U.S. at 146. *See also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (alterations omitted) (warning unequivocally that courts should be "especially reluctant to tamper with the enforcement scheme embodied in the [ERISA] statute by extending remedies not specifically authorized by its text").

We adhered to this rule of constraint in *Rego v. Westvaco Corp.*, 319 F.3d 140 (4th Cir. 2003). In *Rego*, this court declined to recognize a beneficiary's federal common law right to sue an ERISA plan for breach of fiduciary duty and negligent misrepresentation when "Congress clearly contemplated plaintiffs like [the beneficiary] and explicitly created remedies for them within the text of the statute itself." *Id.* at 149. We stated that to recognize a federal common law cause of action in such circumstance would "disregard Congress' decision to limit the scope of those remedies." *Id. See also Pacificare*, 34 F.3d at 836 ("The federal common law that the Court envisioned relates to rights and obligations under the ERISA plan and not to causes of action . . . . Claims relating to ERISA plans must therefore invoke the specific remedies of ERISA." (citation, footnote, and internal quotation marks omitted)).

Just as in *Rego*, it is at odds with ERISA to recognize a federal common law cause of action for unjust enrichment in this case. Congress has clearly contemplated the instance in which a plaintiff like Provident—a fiduciary—may bring suit and what remedies Provident is entitled to under ERISA. Section 1132(a)(3)(B) authorizes a "fiduciary" to bring a civil action against a beneficiary "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . to obtain other appropriate equitable relief . . . to redress such violations or . . . to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C.A. § 1132(a)(3). Because ERISA affords Provident an avenue of relief, this court cannot fashion some additional cause of action or avenue of relief under the federal common law. To do so would circumvent the comprehensive and exclusive remedial scheme Congress enacted for resolving benefit plan disputes governed by ERISA.

We reach this conclusion recognizing that Provident's claim for unjust enrichment is arguably unauthorized under § 1132(a)(3). In

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court denied a fiduciary's restitution claim against a beneficiary when the property sought could no longer be traced to a particular fund or property, because "the fiduciary [was] seeking a legal remedy—the 'imposition of personal liability' on the beneficiary to pay a sum of money owed to the plan"—outside the "equitable relief" afforded to fiduciaries in civil actions under § 504(a)(3). *Mid Altantic Med. Servs., LLC v. Sereboff*, 407 F.3d 212, 218 (4th Cir. 2005) (quoting *Great-West*, 534 U.S. at 214). Likewise, had Provident brought its unjust enrichment claim under § 504(a)(3), its claim would have been barred by the Court's decision in *Great-West*, given that Provident would then be seeking a legal remedy in the form of a money judgment against Cohen, not any "equitable relief" under § 504(a)(3).

Certainly, we do not want to condone Cohen's intentionally misleading conduct in this case. However, we cannot ignore ERISA's proscription of the type of relief sought by Provident and permit a federal common law remedy for unjust enrichment. That is, we cannot afford Provident the right to do that which it cannot do under ERISA. It is simply not within the court's purview to decide the proper balance of rights and remedies under ERISA.

Because one panel may not overrule another panel, *see United States v. Prince-Oyibo*, 320 F.3d 494, 498 (4th Cir. 2003), however, we must consider whether this case falls within the limited circumstance in which this court recognized a federal common law unjust enrichment claim in *Waller*. We conclude that this case is not within *Waller*'s sweep. By relying on the plan language, the statutory policies of ERISA, and state law, the court in *Waller* crafted a narrow federal common law remedy. Notably, in so doing, the court emphasized: "[T]he plan contract . . . provided for repayment of the advanced monies. Thus, the creation of a common law remedy here would *further* the contract between the parties and effectuate the clear intent of [the Plan's] 'Acts of Third Parties' clause." *Waller*, 906 F.2d at 993.

After examining the court's reasoning in *Waller*, the district court found the recognition of a federal common law claim of unjust enrichment unwarranted in this case because there was "no plan lan-

guage requiring reimbursement" for disability benefits erroneously paid to a beneficiary. J.A. 168. That is, no specific provision of the Policy provided for reimbursement of erroneously paid disability benefits.

Provident does not disagree with the district court's conclusion in this respect (i.e, that the Policy has no reimbursement provision). Provident instead argues that, in recognizing a federal common law unjust enrichment claim, the court in *Waller* did not require that the claim further the contract between the parties. A plain reading of *Waller*, however, does not support such an argument. Notably, the *Waller* court distinguished the case before it from other cases that refused to recognize a federal common law unjust enrichment claim by explaining that "the plan contract in the present case provided for the repayment of the advanced monies," *Waller*, 906 F.2d at 993, whereas, in other decisions refusing to recognize a federal common law unjust enrichment claim, the *Waller* court noted that the plan either explicitly authorized the insured's retention of the money recovered from the at-fault party or "was silent" on the issue. *Id.* Here, like the plan distinguished by the court in *Waller*, the Policy is silent with regard to whether Provident should be reimbursed for any erroneously paid benefits.

For the reasons discussed above, we find that Provident was not entitled to recover the benefits paid to Cohen under a federal common law theory of unjust enrichment.

V.

As provided above, we affirm the district court's decision to deny Cohen's counterclaim for reinstatement of either total disability or residual disability benefits under the Policy. We also affirm the district court's decision to deny Provident's unjust enrichment claim. We reverse, however, the district court's decision to grant Provident declaratory relief under § 502(A)(3).

*AFFIRMED IN PART AND REVERSED IN PART*