**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 16-2050**

SKY ANGEL U.S., LLC,

        Plaintiff − Appellant,

    v.

DISCOVERY COMMUNICATIONS, LLC; ANIMAL PLANET, L.L.C.,

        Defendants – Appellees.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge. (8:13-cv-00031-DKC)

Argued: December 7, 2017                    Decided: March 15, 2018

Before WILKINSON and DIAZ, Circuit Judges, and SHEDD, Senior Circuit Judge.

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Wilkinson and Senior Judge Shedd joined.

**ARGUED:** Lynn E. Calkins, HOLLAND & KNIGHT, LLP, Washington, D.C., for Appellant. David Lawrence Yohai, WEIL, GOTSHAL & MANGES LLP, New York, New York, for Appellees. **ON BRIEF:** Jessica L. Farmer, HOLLAND & KNIGHT, LLP, Washington, D.C., for Appellant. Theodore E. Tsekerides, Gregory S. Silbert, David E. Yolkut, New York, New York, Peter D. Isakoff, WEIL, GOTSHAL & MANGES LLP, Washington, D.C., for Appellees.

DIAZ, Circuit Judge:

This case involves a contract dispute between a media company and a television distributor. In October 2007, Sky Angel U.S., LLC obtained nonexclusive distribution rights to Discovery Communications, LLC's television programming. The written contract contained a satisfaction clause allowing Discovery to terminate the agreement if at any time it became dissatisfied with Sky Angel's method of distribution. Discovery exercised this right after learning Sky Angel's distribution path relied on the "public internet."[1] Sky Angel sued, contending that Discovery acted in bad faith because the contract expressly allowed it to use the public internet.

Before trial, the district court held the agreement was susceptible to competing reasonable interpretations as to the scope of Sky Angel's distribution rights. Relying on extrinsic evidence adduced at trial to resolve this ambiguity, the district court found no support for Sky Angel's claim that the contract permitted distribution over the public internet, meaning Discovery acted in good faith when it terminated the contract.

On appeal, Sky Angel claims that the district court erred by holding the agreement was ambiguous and compounded the error by misinterpreting extrinsic evidence. Sky

---

[1] The parties use the phrase "public internet" to refer to the delivery of data over the internet without using a closed dedicated pathway. For example, a point-to-point network that only sends and receives data between two parties would not constitute the public internet. But sending data over an individual's home WiFi would. The difference is that the latter sends and receives multiple types of information along computer networks controlled by myriad parties. For purposes of this appeal, we adopt the nomenclature of the parties although we recognize the term is hardly precise.

Angel also argues that Discovery selectively waived the attorney-client privilege with respect to certain documents. Finding no error in the district court's judgment, we affirm.

## I.

### A.

Sky Angel's problems began with a fall from heaven. The satellite the company used to distribute television services was failing and launching a replacement was cost prohibitive. In need of a new distribution model, Sky Angel landed on Internet Protocol Television or "IPTV."[2] Rather than broadcasting in real time over satellite or cable, IPTV stores programming on servers and then delivers content digitally over a high-speed network that can be configured in any number of ways. Examples of IPTV include online streaming services like Netflix as well as Verizon Fios and AT&T U-verse, which use private fiber-optic cables to deliver live television feeds to set-top boxes.

To develop its IPTV network, Sky Angel partnered with a third company, NeuLion, Inc. Under the model they developed, Sky Angel would receive third-party content at its satellite substation and then transcode and transmit it to NeuLion's servers via a private line. From there, NeuLion would send the encoded signals over the public

---

[2] IPTV refers broadly to the delivery of media content over data networks using Internet Protocol. This protocol results in a two-way interactive network: a viewer requests a specific video signal from their service provider who then delivers the relevant data. By contrast, cable (whether analog or digital) uses a one-way transmission system sending a complete set of video signals to the subscriber's set-top box at all times. Thus the defining feature of IPTV is how it transmits content, not the type of content itself.

internet to subscribers' set-top boxes. In other words, Sky Angel relied on preexisting internet connections provided by third-party internet service providers, rather than its own private lines, to distribute programming. So long as customers had an authorized set-top box and access to the internet, they could receive Sky Angel's programming anywhere in the world.

In 2007, Sky Angel approached Discovery about obtaining programming for its IPTV system. The bulk of the negotiations focused on understanding Sky Angel's new IPTV model. Discovery repeatedly asked whether Sky Angel planned to transmit its content over the public internet, but was told that Sky Angel would not.[3] Discovery also tasked one of its technical engineers with investigating Sky Angel's distribution system, but Sky Angel refused to share all of the requested information. Without knowing more, the engineer advised that while it was possible for Sky Angel to use an entirely closed fiber-optic network, he had "concerns that it may be going over the Internet" which could present "rights issues" for Discovery. J.A. 959–60

In September 2007, Discovery sent Sky Angel a draft distribution agreement, under which Sky Angel would receive a nonexclusive license to distribute five Discovery channels in exchange for monthly payments determined on a per-subscriber basis. The agreement described Sky Angel's distribution system as a "cable television system." J.A. 41. Sky Angel responded by inserting language authorizing it to use IPTV technology, which it defined as:

---

[3] At the time, Discovery had an internal policy prohibiting such distribution.

4

a closed and encrypted transmission path over a national fiber-optic network and a high-speed data connection that may be a digital subscriber line . . . , cable or other broadband connection in a subscriber's home . . . to the secure IP address of a Set-Top Box.

J.A. 42. Discovery countered with its form language, which stated:

Affiliate may utilize TCP/IP transmissions to deliver DSC to DSC Subscribers provided that all transmissions shall be via Affiliate's dedicated, private, closed Ethernet network, which shall have absolutely no connection to the public Internet.

J.A. 440. Following a conference call to address this and other contract issues, Discovery sent, and Sky Angel ultimately signed, a revised agreement. Three provisions bear upon this appeal.

First, the agreement now described Sky Angel's IPTV system as:

a multichannel video distribution system which utilizes Internet Protocol ("IP") technology to deliver video programming services over a closed and encrypted transmission path over a national fiber-optic network to a central location for subsequent distribution of such video programing services with proprietary encoding over a high-speed data connection to set-top-boxes that are secured by industry-standard encryption and conditional access technologies and are connected to Subscribers' television sets.

J.A. 603. Second, the agreement gave Discovery the right to terminate:

[I]n the event [Discovery] determines that the Service signal integrity or the Service signal security measures or distribution methodology used by or on behalf of [Sky Angel] are not satisfactory, [Discovery] shall have the right to terminate this Agreement.

J.A. 612. Finally, the agreement stated that all rights not expressly granted to Sky Angel were reserved to Discovery.

Several months after Sky Angel began broadcasting Discovery programming under the agreement, another distributor, DISH Network, notified Discovery that Sky

5

Angel was sending programming over the public internet. DISH requested the same internet rights as Sky Angel under a most favored nation clause in its contract. Surprised by the request, Discovery reexamined how Sky Angel's IPTV system operated. In particular, it reviewed Sky Angel's website, which marketed its service as "revolutionary television that uses your high-speed Internet service to deliver over 70 faith and family channels—not to your computer—but directly to your TV." J.A. 50. Shortly thereafter, Discovery alerted Sky Angel of its intention to terminate the contract. After confirming that Sky Angel could not deliver content to subscribers without going over the public internet, Discovery formally terminated the agreement.

B.

Sky Angel filed suit in Maryland federal district court for breach of contract. Following a period of discovery, both parties moved for summary judgment. The district court noted that under Maryland law,[4] satisfaction clauses must be exercised in accordance with the duty of good faith and fair dealing, which is breached when one party denies the other their reasonable expectation under the contract.

The district court therefore framed the question as whether Sky Angel had a reasonable expectation that it could use the public internet to distribute Discovery's programming. Finding the contract ambiguous on this point, the district court set the matter for trial to consider extrinsic evidence.

---

[4] The parties agree that Maryland law applies under the contract's choice of law provision.

Following a twelve-day bench trial, the district court found that the evidence did not establish the broad distribution rights Sky Angel claimed. As such, Discovery's termination did not deprive Sky Angel of its reasonable expectations under the agreement and its breach of contract claim failed. The court also denied Sky Angel's motion to compel the production of purportedly privileged documents.

This appeal followed.

## II.

We first address Sky Angel's claim that the district court erred in denying its motion to compel production of the "Myers Memo" and other due diligence documents that Discovery withheld on the basis of the attorney-client privilege.[5] Sky Angel argues that Discovery's trial witnesses selectively disclosed privileged information and therefore waived the attorney-client privilege under Federal Rule of Evidence 502. The district court denied the motion on the ground that the witnesses never discussed a privileged communication. We review a district court's legal conclusions regarding the attorney-client privilege de novo and its factual findings under the clearly erroneous standard. *Hawkins v. Stables*, 148 F.3d 379, 382 (4th Cir. 1998).

---

[5] The Myers Memo, which was created by Discovery's technical engineer during the initial contract negotiations, advised company executives on how Sky Angel's IPTV system operated. Sky Angel claims that the Memo and related communications prove Discovery knew its content would be sent over the public internet when it entered into the distribution agreement with Sky Angel.

Rule 502(a) extends the intentional waiver of the attorney-client privilege to include communications concerning the same subject matter that ought to in fairness be considered together. But to trigger a waiver, there must first be a "disclosure of a communication or information covered by the attorney-client privilege or work-product protection." Fed. R. Evid. 502. Sky Angel says this disclosure occurred when Discovery employees testified that they were unsure if Sky Angel would use the public internet. And because the Myers Memo and associated documents related to Discovery's understanding of the IPTV system, Sky Angel says that those documents should have been considered alongside the trial testimony.

Like the district court, we fail to see what privileged information was disclosed by the employees. It's true that the Myers Memo and the trial testimony relate to Discovery's knowledge of Sky Angel's distribution method, but that doesn't mean the latter is based on privileged information. Sky Angel says the testimony relied on the contents of the Memo, but there's no record support for that claim. We also decline to infer this fact merely because Discovery sought legal advice on the same topic as its employees' testimony. Sky Angel must prove the disclosure of a communication in confidence between a lawyer and a client related to legal advice. *See Upjohn Co. v. United States*, 449 U.S. 383, 389–90 (1981). Because it failed to do so, we decline to upset the district court's ruling.

## III.

We turn now to Sky Angel's breach of contract claim. We review a district court's factual findings after a bench trial for clear error and its legal conclusions de novo. Fed. R. Civ. P. 52; *Helton v. AT & T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013). Under Maryland law, a party with discretion to terminate a contract "is limited to exercising that discretion in good faith and in accordance with fair dealing." *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009). Whether a party has exercised its contractual rights in good faith is a question of fact. *David A. Bramble, Inc. v. Thomas*, 914 A.2d 136, 149 (Md. 2007).

The court's role is to determine only whether Discovery's determination was consistent with the reasonable expectations of Sky Angel, in light of their agreement. *Questar*, 978 A.2d at 676. Thus to prevail, Sky Angel must establish that it had a reasonable expectation that it could distribute Discovery's content over the public internet. *See id.* at 675.

We conclude (as did the district court) that the contract is ambiguous on this question. The district court was therefore correct to consider extrinsic evidence of the parties' intent. And we find no error (clear or otherwise) in the district court's factual findings that Sky Angel had no reasonable expectation that it could distribute Discovery's content over the public internet and consequently, Discovery exercised its termination rights in good faith.

9

A.

We begin with Sky Angel's contention that the contract expressly permits it to distribute Discovery's content via the public internet. Sky Angel argues that the internet is by definition a type of high-speed data connection and thus within the "IP System" outlined in the agreement, which covers distribution of "video programming services with proprietary encoding over a high-speed data connection." J.A. 603. Because this language is unambiguous, Sky Angel adds that we should not consider extrinsic evidence regarding the parties' intent but apply the contract as written. Discovery responds that distribution over a closed pathway would also qualify as a "high-speed data connection" and that the contract's silence on the use of the internet should not be construed as an affirmative grant in light of the contract provision reserving all rights to Discovery.[6] We agree with Discovery.

Maryland adheres to the objective theory of contracts, "giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean." *Towson Univ. v. Conte*, 862 A.2d 941, 946–47 (Md. 2004). It is only when a contract is ambiguous that courts may consult extrinsic evidence to

---

[6] Relying on our decision in *Chesapeake Paper Prod. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1235 (4th Cir. 1995), Discovery also contends that Sky Angel waived its claim that the contract is unambiguous by failing to renew the argument following trial. Sky Angel responds that *Chesapeake* and its progeny preclude review of factual issues raised in a summary judgment motion but not the legal conclusions a court adheres to at trial. Ultimately, we need not resolve this question because the district court correctly found the contract was ambiguous.

"determine and effectuate the intent of the parties." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (applying Maryland law). "A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Nova Research, Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275, 283 (Md. 2008). In making this determination, courts should focus on "the entire language of the agreement, not merely a portion thereof" and apply "the customary, ordinary and accepted meaning of the language used." *Id.* A court must also examine "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 929 A.2d 932, 952 (Md. 2007). "[C]ontract interpretation, including the determination of the ambiguity of a contract, is a question of law and subject to de novo review." *Id.* at 951. (internal quotation marks omitted.).

Sky Angel's argument rests heavily on the definition of "IP System" contained in the agreement. Sky Angel argues that the portion of this definition related to "subsequent distribution . . . over a high-speed data connection" plainly covers the second step in its distribution path, in which NeuLion would send encrypted data over the internet to subscriber's set-top boxes for viewing. Sky Angel relies on dictionary definitions of "high-speed," "data," and "connection" to argue that the phrase refers to the fast transmission of digital information. Though broad, it points out that these definitions are not ambiguous, and the contract does not contain any restrictions on specific types of high-speed data connections, such as the public internet.

11

We agree with Sky Angel that broad terms do not necessarily render a contract ambiguous. But there comes a point, like here, when contractual language covers such a wide range of meanings so as to make the contract unclear and inexact. "High-speed data connection" tells us nothing about whether that connection must be a closed path between Sky Angel and the subscriber, or can be an open network, so as to permit the use of the public internet.

Nor does the agreement permit Sky Angel to use *any* type of "high-speed data connection." The relevant provision was meant to capture the specific IPTV system Sky Angel described to Discovery by detailing the first and second steps in the transmission process. Taking into account this context and purpose means the phrase is describing *one* type of data connection, not several as Sky Angel contends. *See Diamond Point Plaza*, 929 A.2d at 952. But "high-speed data connection" could refer to any number of transmission systems including private optical networks, digital radio transmissions, wireline communications, the public internet, or a combination of analog and digital networks via signal conversion.

Sky Angel also reads the definition of "IP System" in isolation. But Maryland law instructs courts to consider the entire contract when deciding if it is ambiguous. *Id*. According to Sky Angel's president, a "high-speed data connection" "could be a number of things. It may even give us room when there was some new technology that was high-speed . . . to use it under this definition." J.A. 528. But such an expansive reading would make the reservation of rights in the agreement largely pointless. Using a definitional provision to grant internet rights is also at odds with the structure of the contract, which

lists the grant of rights and describes the distribution methodology in separately titled sections.

Because the text of the contract is ambiguous, the district court was right to consider extrinsic evidence to discern the parties' intent. *Fister ex rel. Estate of Fister v. Allstate Life Ins. Co.,* 783 A.2d 194, 203 (Md. 2001).

B.

Sky Angel claims that even if the contract is ambiguous, extrinsic evidence proves it was permitted to use the public internet. It complains further that the district court failed to fully consider the drafting history, industry definitions, and Sky Angel's own understanding of the contract. Our review here, however, is limited to whether the district court's factual findings are clearly erroneous. *Provident Life & Accident Ins. Co. v. Cohen*, 423 F.3d 413, 418 (4th Cir. 2005). It's not enough that we would have reached a different result had we considered the question in the first instance. *Id.* Reversal requires us to be left with a definite and firm conviction that a mistake has been committed. *Id.*

If a contract is ambiguous, Maryland courts "consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 547 (Md. 2003). The focus is on determining "the intent and purpose of the parties at the time the agreement was made," not as Sky Angel mistakenly argues, what a reasonable person would have intended. *Cty. Comm'rs of Charles Cty. v. St. Charles Assocs. Ltd.*

*P'ship*, 784 A.2d 545, 557 (Md. 2001). We discern no error in the district court's evaluation of the evidence.

The district court concluded (we think correctly) that "neither side took the time and effort to ascertain precisely what Sky Angel's IPTV system entailed, or what the specific terms and phrases in the Agreement meant, or were intended to mean." J.A. 69–70.[7] As a result, the court looked to Discovery's internal policy prohibiting distribution of its linear programming over the public internet. Granting Sky Angel the rights it claims under the contract would be a clear violation of Discovery's own rules.

The importance of the policy is confirmed by the fact that none of Discovery's other affiliation agreements, including those with national cable and satellite companies, had ever granted distribution rights over the public internet. While recognizing that the precise language differed from contract to contract, the district court credited testimony that the basic meaning was the same: "affiliates are not to deliver content over the Internet." J.A. 74. Indeed, granting Sky Angel the right to use the public internet meant that Discovery had to extend that same right to its other distributors, something

---

[7] Sky Angel says the district court ignored changes in the third draft of the contract, which removed a previous definition of "IP System" that stated it "shall have absolutely no connection to the public Internet." J.A. 519. Both sides, however, understood this reference to public internet to mean the World Wide Web and thus prohibiting online streaming, not distribution over the open internet generally. This makes its omission in the final draft less than helpful on the question before us. We note also that Discovery rejected language drafted by Sky Angel that would have expressly permitted public internet distribution by defining "IP System" to mean a "a high-speed data connection *that may be a digital subscriber line (commonly referred to as 'DSL'…), cable or other broadband connection in a subscriber's home.*" J.A. 179 (emphasis added).

Discovery had made clear to Sky Angel it was unwilling to do. As a result, the district court concluded that Discovery never intended to grant Sky Angel the right to distribute content over the public internet.

Sky Angel doesn't challenge this conclusion but says it represents only one party's view of the contract that was never made known to Sky Angel. But Discovery repeatedly told Sky Angel that it could not send Discovery's content over the public internet since Discovery lacked the requisite programming rights. In response, Sky Angel repeatedly assured Discovery that it used a closed system.

Discovery's concerns were also common within the industry and thus well known to Sky Angel. Walt Disney, Food Network, Golf Channel, and HGTV all ended their negotiations with Sky Angel after learning their content would be distributed using the public internet. And other networks either pulled their programming or let their contracts lapse after getting wind of Sky Angel's distribution method.

In sum, the problem for Sky Angel is not that the district court ignored evidence related to Sky Angel's understanding of the contract, but that this evidence doesn't support its case. To prove that Discovery breached the implied covenant of good faith and fair dealing, Sky Angel had to show that it was deprived of its "reasonable expectations" under the contract. *Questar*, 978 A.2d at 676–77.[8] But while Sky Angel

---

[8] In a Hail Mary, Sky Angel says Discovery terminated the contract because it didn't want to extend internet distribution rights to DISH under the most favored nation clause in its agreement. Like the district court, we find no evidence in the record to support this argument. And we agree with the district court that "Sky Angel cannot reasonably expect that Discovery would not, when prompted by external parties and

15

claims it could distribute content over the public internet, this is not apparent from the text of the agreement nor from extrinsic evidence related to the parties' intent. Having failed to establish any such expectation under the contract, Sky Angel cannot show that Discovery acted in bad faith when it terminated the agreement.

IV.

For the reasons given, the judgment of the district court is

*AFFIRMED.*

---

supplied with new information, reexamine Sky Angel's distribution methodology and become dissatisfied." J.A. 82. The mere fact that a third party notified Discovery about Sky Angel's distribution method does not taint the eventual decision to terminate.