**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Maple Hts. v. Netflix, Inc.*, **Slip Opinion No. 2022-Ohio-4174.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4174

THE CITY OF MAPLE HEIGHTS *v*. NETFLIX, INC., ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Maple Hts. v. Netflix, Inc.*, Slip Opinion No. 2022-Ohio-4174.]**

*Civil actions—Fair Competition in Cable Operations Act—R.C. Chapter 1332.21—Director of commerce has the sole authority to grant video-service authorizations and to investigate allegations that a video-service provider is violating or failing to comply with R.C. Chapter 1332.21—R.C. Chapter 1332.21 does not imply a private right of action.*

(No. 2021-0864—Submitted April 13, 2022—Decided November 30, 2022.)

ON ORDER from the United States District Court for the Northern District of Ohio, Eastern Division, Certifying Questions of State Law, No. 1:20-CV-01872.

_____

**DONNELLY, J.**

**{¶ 1}** The United States District Court for the Northern District of Ohio, Eastern Division, certified the following two state-law questions for our review:

(1) "Are Netflix and Hulu video service providers under Ohio law?" and (2) "Can Maple Heights sue Netflix and Hulu to enforce Ohio's video service provider provisions?" 164 Ohio St.3d 1440, 2021-Ohio-3233, 173 N.E.3d 1227. We agreed to answer both questions. *Id.*

{¶ 2} Respondent, city of Maple Heights, filed a federal class-action and declaratory-judgment lawsuit against petitioners, the video-streaming services Netflix Inc., and Hulu, L.L.C. In that lawsuit, Maple Heights asserts that Netflix and Hulu are in violation of the Fair Competition in Cable Operations Act, R.C. Chapter 1332.21, 2007 Am.Sub.S.B. No. 117 ("the Act"). Specifically, Maple Heights argues that Netflix and Hulu are illegally providing video services in Ohio—including in Maple Heights—without authorization from the director of commerce and without paying the requisite fees to Maple Heights. Netflix and Hulu separately filed motions to dismiss Maple Heights's complaint against them in federal court, arguing that their streaming services do not fall within the Act.

{¶ 3} As to the first certified state-law question, the federal court asks us to determine whether Netflix and Hulu are video-service providers under the Act. As to the second certified state-law question, the federal court asks us to determine whether Maple Heights may sue Netflix and Hulu as a means of enforcing the Act, particularly in light of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and *Anderson v. Smith*, 196 Ohio App.3d 540, 2011-Ohio-5619, 964 N.E.2d 468 (10th Dist.), which consider the circumstances under which a statute implies a private right of action. For the following reasons, we hold that (1) Netflix and Hulu are not video-service providers under the Act and (2) the Act does not expressly or impliedly give Maple Heights the authority to bring a cause of action such as the one at issue here.

{¶ 4} Accordingly, the answer to both certified state-law questions is "no."

## I. BACKGROUND

{¶ 5} Netflix and Hulu are video-content providers that stream on-demand shows and movies to their subscribers over the Internet. Netflix's and Hulu's members may stream as much content as they want—anytime, anywhere, and on any public Internet-connected device. Because Netflix and Hulu make their content available through the public Internet,[1] they do not maintain wires, cables, or other infrastructure in any Ohio public rights-of-way. Netflix began its streaming media service in 2007. Hulu began streaming to the public in 2008.

{¶ 6} Prior to the Act, businesses would enter into franchise agreements with, and pay franchise fees to, local governments for the right to install wires in the public rights-of-way to service their customers. *See, e.g.*, *Vernon v. Warner Amex Cable Communications, Inc.*, 25 Ohio St.3d 117, 120, 495 N.E.2d 374 (1986) (municipalities had home-rule authority to enter agreements with cable-service providers to use municipal rights-of-way). However, effective September 24, 2007, the Act abolished the authority of local governments to require new franchise agreements from cable-service providers and established a statewide regulatory scheme in which the director of commerce is the sole franchising authority of certain video services in this state. R.C. 1332.23(A) and 1332.24(A).

{¶ 7} R.C. 1332.23(A) prohibits any person from providing video services in Ohio without a video-service authorization that has been issued by the director of commerce. " 'Video service' " means the provision of video programming over wires or cables located at least in part in public rights-of-way, regardless of the technology used to deliver that programming, including internet protocol technology or any other technology. The term includes cable service * * *." R.C.

---

1. The phrase "public internet" is not defined in the Act; however, it has been defined as "the delivery of data over the internet without using a closed dedicated pathway." *Sky Angel U.S., L.L.C. v. Discovery Communications, L.L.C.*, 885 F.3d 271 (4th Cir.2018), fn. 1. But this definition "is hardly precise." *Id.*

1332.21(J). While the term "video service" includes cable service, it does not include

> video programming provided to persons in their capacity as subscribers to commercial mobile service * * *; video programming provided solely as part of and via a service that enables users to access content, information, electronic mail, or other services offered over the public internet.

*Id*.

## II. POSITIONS OF THE PARTIES

{¶ 8} Netflix and Hulu claim that the Act does not pertain to them because neither Netflix nor Hulu construct or operate wires, cables, facilities, or networks in the public rights-of-way. Rather, subscribers connect to Netflix's and Hulu's services through the subscribers' own Internet-connected devices. They further argue that because they have never held video-services authorizations pursuant to R.C. 1332.21 through 1332.34, they do not meet the statutory definition of a video-service provider (a " '[v]ideo-service provider' means a person granted a video service authorization under sections 1332.21 to 1332.34 of the Revised Code," R.C. 1332.21(M)). Netflix and Hulu each assert that a business without that authorization is, by definition, not a video-service provider. The parties agree that neither Netflix nor Hulu have a video-service authorization.

{¶ 9} In Netflix's and Hulu's motions to dismiss in federal court, they each asserted that (1) they do not offer video-programming services that are comparable to broadcast television under R.C. 1332.21(I), [2] (2) they offer their programming

---

2. R.C. 1332.21(I) states that " '[v]ideo programming' has the same meaning as in the 'Cable Communications Policy Act of 1984' * * *." Accordingly, "the term 'video programming' means

and content over the public Internet, which they assert is exempted from the definition of "video service" under R.C. 1332.21(J), and (3) they do not own, operate, or use video-service networks in the public-rights-of-way under R.C. 1332.21(J).

{¶ 10} Independently, Hulu asserted in its motion to dismiss that Maple Heights is an improper party to file a complaint in federal court. Hulu argues that Ohio's General Assembly authorizes only the director of commerce to bring actions to enforce the Act, not municipalities.

{¶ 11} Maple Heights countered that even if Netflix and Hulu do not own, operate, or use video-service networks, they are video-service providers as defined by R.C. 1332.21(J) because the services that they provide—i.e., shows, movies, and other similar content—are comparable to broadcast television as provided in R.C. 1332.21(I). Maple Heights also asserted that Netflix and Hulu do not offer programming over the public Internet and, even if they did, their programming is not offered as "part of and via a service that enables users to access content, information, electronic mail, or other services offered over the public internet," as required by R.C. 1332.21(J) to be excluded from the definition of "video service."

{¶ 12} In its merit brief, Maple Heights also notes that to be considered a video-service provider under the Act, the provider does not need to own the wires and cables over which it streams, only that it provides video-service content over cables and wires. In addition, Maple Heights asserts that "while the Act provides authorization for video service providers to construct or operate video service networks in the public rights-of-way, it does not mandate that only video service providers who construct and operate networks in the public rights-of-way are required to hold a video service authorization."

---

programming provided by, or generally considered comparable to programming provided by, a television broadcast station." Cable Communications Policy Act of 1984, Pub.L. No. 98-549, 98 Stat. 2779.

{¶ 13} The parties also disagree about the reach of R.C. 1332.32, which imposes a quarterly fee that video-service providers owe to municipalities. While the Act precludes local governments from requiring the payment of franchise fees from video-service providers, R.C. 1332.32(A) requires video-service providers to pay "a video service provider fee to each municipal corporation and each township in which it offers video service." R.C. 1332.33(A) authorizes any local government to perform annual audits at its own expense, and R.C. 1332.33(B) authorizes the local government to recoup any underpayment found in the audit with interest. And both the local government and the video-service provider have a right to challenge the audit in a "court of competent jurisdiction." R.C. 1332.33(D). This provision of the Act authorizes local governments to collect video-service-provider fees, but only against video-service providers.

{¶ 14} Indeed, the director of commerce has the sole authority to investigate alleged violations of the video-service-authorization requirements, R.C. 1332.24(B)(1), to subpoena witnesses and order the production of documents during the investigation, R.C. 1332.24(B)(2), and to seek injunctive relief for uncured violations, R.C. 1332.24(C)(1)(a). Because Netflix and Hulu assert that they are not video-service providers, neither has paid any video-service fees to any of Ohio's municipalities. And other than conducting an audit "for the purpose of verifying the accuracy of a video service provider's calculation of the video service provider fees" not more than one time a year at its own expense, R.C. 1332.33(A), the Act does not explicitly authorize a local government's cause of action against such providers.

{¶ 15} Maple Heights counters that because the legislature gives municipalities the authority to bring actions against video-service providers who fail to pay their full video-service-provider fees under R.C. 1332.33(A), Maple Heights has the authority to bring the underlying action in federal court. Maple Heights further argues that even if the underlying action falls outside the scope of

6

R.C. 1332.33, the federal court should "infer" that the General Assembly intended to give local governments the authority to bring enforcement actions against video-service providers.

{¶ 16} According to Maple Heights, reading R.C. 1332.33(D) as limiting a municipality's ability to bring a cause of action only to recover an underpayment based on an audit would lead to an absurd result—i.e., "allowing municipalities to enforce the Act against those that fail to make full payment but not those that ignore the requirements of the Act entirely." Even if there is no express right, Maple Heights argues that it has an implied right of action based on the three-part test set forth in *Cort*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26. "That test examines: (1) whether the statute creates a right in favor of the plaintiff, (2) whether there is any indication of legislative intent, explicit or implicit, to create or deny a remedy through a private right of action, and (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy." *Anderson*, 196 Ohio App.3d 540, 2011-Ohio-5619, 964 N.E.2d 468, at ¶ 10. Maple Heights asserts that because (1) the Act creates a right in its favor, (2) there is explicit legislative intent to create a right of remedy to Maple Heights, and (3) it is consistent with the underlying purpose of the Act to imply a right of remedy to Maple Heights. Contrary to the assertions of Netflix and Hulu, Maple Heights quotes *Upperman v. Grange Indemn. Ins. Co.*, 135 Ohio Misc.2d 8, 2005-Ohio-6227, 842 N.E.2d 132, ¶ 11 (C.P.), and argues that Ohio courts imply a "private right of action" when the "statute does not explicitly state that a private right of action 'is not available as a supplement to other remedies' and those affected by non-compliance with the statute will not have an adequate remedy."

## III. STANDARD OF REVIEW

{¶ 17} We begin by interpreting a series of statutes. "When the statutory language is plain and unambiguous, and conveys a clear and definite meaning, we must rely on what the General Assembly has said." *Jones v. Action Coupling &*

*Equip., Inc.*, 98 Ohio St.3d 330, 2003-Ohio-1099, 784 N.E.2d 1172, ¶ 12. "The question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact." *Slingluff v. Weaver*, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus. "The interpretation of a statute is a question of law that we review de novo." *Stewart v. Vivian*, 151 Ohio St.3d 574, 2017-Ohio-7526, 91 N.E.3d 716, ¶ 23.

## IV. LEGAL ANALYSIS

### A. Question No. 1

**{¶ 18}** First, the federal court asks us to determine whether Netflix and Hulu are video-service providers under Ohio law. The answer is "no." The Act makes clear that only the director of commerce may determine whether an entity is a video-service provider, and no portion of the Act authorizes a local government to challenge that determination. The director of commerce is empowered to "issue to any person, or renew, a video service authorization." R.C. 1332.24(A)(1). The video-service authorization permits the person "to provide video service in its video service area; construct and operate a video service network in, along, across, or on public rights-of-way for the provision of video service; and, when necessary to provide that service." *Id*. The director of commerce may also impose an annual assessment on video-service providers and collect it from them. R.C. 1332.24(A)(3).

**{¶ 19}** R.C. 1332.21(J) states that " '[v]ideo service' means the provision of video programming over wires or cables located at least in part in public rights-of-way." R.C. 1332.21(J) also states that the definition of video service includes cable service but excludes "video programming provided solely as part of and via a service that enables users to access content, information, electronic mail, or other services offered over the public internet." Because Netflix and Hulu provide online-streaming services over the public Internet, they are not video-service providers. They do not need to place their own wires or equipment in the public

rights-of-way to provide their subscribers with their programming, and the equipment used to access their services belongs to their customers, not to them. Therefore, neither Netflix nor Hulu is required to obtain a video-service authorization.

*B. Question No. 2*

**{¶ 20}** Second, the federal court asks us to determine whether Maple Heights has authority to bring an action against Netflix and Hulu to enforce Ohio's video-service-provider provisions. The answer is "no."

**{¶ 21}** As previously stated, R.C. 1332.24(A)(2) is unambiguous: the director of commerce is the sole franchising authority. He or she is empowered to investigate allegations or complaints against a video-service provider if that provider is failing to comply with the Act's requirements. R.C. 1332.24(B)(1). Indeed, the purpose of the Act was to eliminate local governments' control over video-service providers. R.C. 1332.22(H) and (K).

**{¶ 22}** The Act also limits the authority of local governments. Local governments are authorized to conduct an annual audit to verify the "accuracy" of a video-service provider's calculation of the fees to be paid to local governments. R.C. 1332.33(A). And local governments may bring an action in a court of competent jurisdiction "to dispute the amount of video service provider fee due based on the audit results." R.C. 1332.33(D). R.C. 1332.33 does not state or infer what Maple Heights would like for it to state or infer; Maple Heights simply does not have express statutory authority to bring the underlying action to enforce the Act. The legislature knows how to grant local governments such authority and chose not to do so here. *See* former R.C. 1332.09, Am.Sub.S.B. No. 67, 148 Ohio Laws, Part IV, 8593, 8601 (expressly providing local governments with a cause of action).

**{¶ 23}** Maple Heights also asks this court to *infer* an unwritten right to bring suit. Citing *Anderson*, 196 Ohio App.3d 540, 2011-Ohio-5619, 964 N.E.2d 468, at

¶ 10, Maple Heights argues that "a private right of action should be inferred from a statute" based on "a three-part test adapted from the United States Supreme Court decision in *Cort*, [422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26]." The three-part test established in *Cort* and echoed in *Anderson* examines (1) whether the plaintiff is within the class for whose benefit the statute was enacted, (2) whether the statute reflects the legislature's intent to create or deny a remedy through a private right of action, and (3) whether inferring such a remedy is consistent with the purposes of the statute. *Cort* at 78; *Anderson* at ¶ 10. All these factors weigh against Maple Heights.

{¶ 24} First, Maple Heights is not within the class meant to benefit from the Act. The purpose of the Act is to take away a local government's power to regulate video-service-franchise agreements for the benefit of the video-service market, Ohio's infrastructure and economy, and Ohio's consumers. R.C. 1332.22(J).

{¶ 25} Second, nothing in the Act indicates that the General Assembly intended to create a right of remedy for a local government to enforce the video-service-authorization and franchise-fee requirements of the Act against a business that the local government thinks ought to be designated as a video-service provider. In fact, the plain language of the Act indicates that the General Assembly intended to foreclose rights of remedy for local governments and to leave the director of the Ohio Department of Commerce with the sole authority to issue video-service authorizations and to investigate alleged violations of the Act. R.C. 1332.22(H) and 1332.24.

{¶ 26} To the extent that local governments have any power at all under the Act, it is extremely limited in scope. Regarding businesses that have already received state authorization to provide video services under R.C. 1332.24, local governments have the option to use their own funds to audit a video-service provider's calculation of fees, R.C. 1332.33(A); they also have the limited authority to sue video-service providers over disputes about those fees, R.C. 1332.33(D).

The fact that the General Assembly provided a narrow right of remedy to local governments in R.C. 1332.33(D) and nowhere else in the Act indicates that all other rights of remedy are unavailable to local governments. *See Thomas v. Freeman*, 79 Ohio St.3d 221, 225, 680 N.E.2d 997 (1997).

{¶ 27} Third, inferring the right of remedy for a local government like Maple Heights would be inconsistent with the Act's purpose of eliminating the patchwork authority previously exercised by local governments and instead centralizing the authority with the director of commerce. *See* R.C. 1332.22. There is no way to infer that creating a right of action to local governments would further the goal of eliminating local governments' authority.

{¶ 28} Therefore, in response to the second certified state-law question asking us to apply the test established by the United States Supreme Court in *Cort*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26, the answer is "no." Maple Heights has no right, either express or implied, to bring a cause of action against Netflix or Hulu under the Act.

## V. CONCLUSION

{¶ 29} Netflix and Hulu are online-streaming businesses that service their subscribers over the public Internet. The General Assembly defined video service to the exclusion of those who provide "video programming * * * solely as part of and via a service that enables users to access content, information, electronic mail, or other services offered over the public internet." R.C. 1332.21(J). And the purpose of the Act as expressed by its language is to eliminate the authority of local governments, like Maple Heights, over video-service franchises. The director of commerce has the sole authority to grant video-service authorizations and to investigate allegations that a video-service provider is violating or failing to comply with the Act. To read the Act as granting Maple Heights an implied right to bring the underlying action under *Cort* would be contrary to its stated intent.

{¶ 30} Therefore, we answer both certified state-law questions in the negative.

So answered.

O'CONNOR, C.J., and STEWART and BRUNNER, JJ., concur.

KENNEDY, J., concurs in judgment only, with an opinion joined by FISCHER and DEWINE, JJ.

_____

**KENNEDY, J., concurring in judgment only.**

{¶ 31} The United States District Court for the Northern District of Ohio, Eastern Division, certified two state-law questions for our review: (1) "Are Netflix and Hulu video service providers under Ohio law?" and (2) "Can Maple Heights sue Netflix and Hulu to enforce Ohio's video service provider provisions?" 164 Ohio St.3d 1440, 2021-Ohio-3233, 173 N.E.3d 1227. I agree with the majority that petitioners, Netflix, Inc., and Hulu, L.L.C., are not video-service providers and that the Fair Competition in Cable Operations Act, R.C. Chapter 1332.21, 2007 Am.Sub.S.B. No. 117 ("the Act"), does not allow local governments to bring an action to enforce its requirements.

{¶ 32} I write separately, however, because this court should not entertain respondent city of Maple Height's request that we read between the lines of the Act to create an implied cause of action that the General Assembly itself chose not to enact. Because the idea of a court recognizing an implied statutory cause of action is contrary to our rules of statutory interpretation and to basic concepts of our tripartite form of government that separates the legislative function from the judicial, I concur in the majority's judgment, but neither its reasoning nor its analysis.

### I. Implied Causes of Action

{¶ 33} Maple Heights asks this court to *infer* an unwritten right to bring suit, invoking caselaw that says, "a private right of action should be inferred from a

statute" based on a three-part test adapted from the United States Supreme Court decision in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). "That test examines: (1) whether the statute creates a right in favor of the plaintiff, (2) whether there is any indication of legislative intent, explicit or implicit, to create or deny a remedy through a private right of action, and (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy." *Anderson v. Smith*, 196 Ohio App. 3d 540, 2011-Ohio-5619, 964 N.E.2d 468, ¶ 10 (10th Dist.). It is true that *Anderson* and other lower courts have employed the first three factors of *Cort*'s test for an implied right of action. *See Anderson* at ¶ 10 (citing cases). But this court has never done so and should not now.

{¶ 34} Rather, this court has described creating an "implied private statutory cause of action" as "trying to fit a round peg into a square hole." *Biddle v. Warren Gen. Hosp.*, 86 Ohio St. 3d 395, 400, 715 N.E.2d 518 (1999). In one rare instance when this court considered finding a cause of action implied in a statute, we stated that "the General Assembly" must have "by 'clear implication' intended to create a civil action." *Fawcett v. G. C. Murphy & Co.*, 46 Ohio St. 2d 245, 249, 348 N.E.2d 144 (1976). There, the "clear implication" cut decidedly against inferring a cause of action because "the Department of Industrial Relations [was] vested with authority to enforce" the law in question. *Id*. The same result would follow here because, as explained in more detail below, the Act vests the director of commerce with authority to enforce the Act. R.C. 1332.24(C)(1).

{¶ 35} Moreover, the Supreme Court itself has backed away from creating implied causes of action in statutes. Since the *Cort* decision, in which the United States Supreme Court declined to find an implied cause of action, *id*. at 85, the court has clarified that "private rights of action to enforce federal law must be created by Congress," *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S. Ct. 1511, 149 L.Ed.2d 517 (2001). Therefore, when Congress has not stated a cause of action, one "does not exist and courts may not create one, no matter how desirable that might be as a

policy matter, or how compatible with the statute." *Id.*; *see also Ziglar v. Abbasi*, ___ U.S. ___, ___, 137 S.Ct. 1843, 1856, 198 L.Ed.2d 290 (2017); *Nestle USA, Inc. v. Doe*, ___ U.S. ___, ___, 141 S.Ct. 1931, 1937, 210 L.Ed.2d 207 (2021) (plurality) ("[federal] courts must refrain from creating a cause of action whenever there is even a single sound reason to defer to Congress").

{¶ 36} The idea that a court should read between the lines of statutory text to recognize an implied cause of action is a relic from a different time. *Alexander* at 287. It had once been the rule that "[w]here the plain meaning of words used in a statute produce[d] an unreasonable result, 'plainly at variance with the policy of the legislation as a whole,' *we [could] follow the purpose of the statute rather than the literal words*." (Emphasis added.) *United States v. N. E. Rosenblum Truck Lines*, 315 U.S. 50, 55-56, 62 S.Ct. 445, 86 L.Ed. 671 (1942), quoting *United States v. Am. Trucking Assns.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). Indeed, when deciding whether to imply a cause of action, "it [was] the duty of the courts to be alert to provide such remedies as [were] necessary to make effective the congressional purpose" when the legislature enacted the statute at issue, *J.I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), *abrogation recognized by Zigler v. Abbasi*, ___ U.S. ___, ___, 137 S.Ct. 1843, 1855, 198 L.Ed.2d 290 (2017). This purposivism reflected "[t]he false notion that when a situation is not quite covered by a statute, the court should reconstruct what the legislature would have done had it confronted the issue." (Boldface omitted.) Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 349 (2012).

{¶ 37} But that is no longer how courts approach statutory interpretation. As the Supreme Court recently explained:

> This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by

Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations.

*Bostock v. Clayton Cty., Georgia*, ___ U.S. ___, ___, 140 S.Ct. 1731, 1738, 207 L.Ed.2d 218 (2020). As Justice Elena Kagan has famously put it, "we're all textualists now." Harvard Law School, *The Antonin Scalia Lecture Series: A Dialogue with Justice Elena Kagan on the Reading of Statutes*, available at https://www.youtube.com/watch?v=dpEtszFT0Tg (accessed Oct. 10, 2022) [at 08:29] [https://perma.cc/3LX6-PBBL].

{¶ 38} The test in *Cort*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26, is not just inconsistent with the textualist approach to interpreting statutes. A court's decision to create an implied cause of action in a statute that does not provide one runs counter to the basic theory of our tripartite form of government. An implied cause of action exists when a court believes the legislature *should have* created a right of action *but did not*, and then supplies the cause of action through judicial lawmaking. But the people of Ohio, in adopting our Constitution, separated the powers of government and vested the legislative power in the General Assembly, Article II, Section 1, the executive power in the Governor, Article III, Section 5, and the judicial power in the courts, Article IV, Section 1. To recognize an implied cause of action in a statute is to judicially amend that statute to provide a cause of action that the General Assembly did not enact. That power is denied to the courts. Adding words to a statute is a legislative function reserved solely to the General

Assembly under the American form of government. The majority's willingness to read something into a statute that does not exist threatens our form of government.

*A. The General Assembly Did Not Give Maple Heights Express Statutory*

*Authority to Bring an Action to Enforce the Act*

**{¶ 39}** The Act clearly and unambiguously denies local governments an express right of action to enforce its requirements. In fact, history and the statutory text reveal that the General Assembly intended to eliminate the role local governments once played in the regulation of video programming in Ohio. *See* R.C. 1332.22(H) and (K).

**{¶ 40}** The relevant history begins with the Communications Act of 1934, which combined the Interstate Commerce Commission's regulatory authority over wired communication (telegraph and telephone) with the Federal Radio Commission's oversight of radio broadcasting into one agency: the Federal Communications Commission ("FCC"). *Scripps-Howard Radio v. Fed. Communications Comm.*, 316 U.S. 4, 6, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); Robinson, *The "New" Communications Act: A Second Opinion*, 29 Conn.L.Rev. 289, 291 (1996).

**{¶ 41}** Preempting conflicting state laws, the Communications Act gave the FCC exclusive jurisdiction to regulate over-the-air broadcasting. *See Natl. Broadcasting Co. v. United States*, 319 U.S. 190, 214, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Robinson and Nachbar, *Communications Regulation* 10 (2008). The FCC assigned specific frequencies to broadcasters to prevent one station from interfering with another's signal. *Turner Broadcasting Sys., Inc. v. Fed. Communications Comm.*, 512 U.S. 622, 637, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). However, to ensure that every community would be served by at least one local station, the FCC discouraged the development of high-powered stations that could reach regional or national audiences, leaving rural and midsized communities with few channels to

watch. 1 *Telecommunications & Cable Regulation*, The Development of Cable in [the] 1950s, Section 5.03 (2021).

{¶ 42} The first cable systems stepped into this void "to improve reception of over-the-air broadcast signals for subscribers in locations far removed from local television stations, or where topographical barriers prevented the clear reception of television signals." 1 Brenner, Price, and Meyerson, *Cable Television and Other Nonbroadcast Video*, Section 1.2 (2022). Because they simply retransmitted broadcast television signals from other markets through cables without interfering with over-the-air broadcasts, they were generally not regulated by the FCC. *Telecommunications & Cable Regulation*, at Section 5.03. Instead, local governments became the principal regulators of cable-television systems, using their home-rule powers to grant franchises to cable companies to operate within their boundaries and exacting franchise fees from cable companies to attach wires to utility poles in the public rights-of-way to provide cable-television service to customers. *See* Brenner, Price, and Meyerson, at Sections 3.4, 3.5, and 5.2; *see also Vernon v. Warner Amex Cable Communications, Inc.*, 25 Ohio St.3d 117, 120, 495 N.E.2d 374 (1986) (recognizing that municipalities have home-rule authority to enter agreements with cable providers to use municipal rights-of-way).

{¶ 43} This changed in Ohio effective September 24, 2007, when the Act abolished the authority of local governments to require new franchise agreements from video-service providers and established a statewide regulatory scheme in which the director of commerce is the sole franchising authority for the provision of video services in this state. R.C. 1332.23(B); R.C. 1332.24(A). The Act was intended to be a "comprehensive legislative enactment operating uniformly throughout this state, setting forth police regulations, and prescribing a rule of conduct upon citizens generally," R.C. 1332.22(K), thereby eliminating the power of local governments to regulate video service.

**{¶ 44}** A video-service authorization is issued by the director of commerce and permits the holder "to provide video service in its video service area; construct and operate a video service network in, along, across, or on public rights-of-way for the provision of video service; and, when necessary to provide that service, exercise the power of a telephone company." R.C. 1332.24(A)(1). The director may impose an annual assessment on video-service providers and collect it from them. R.C. 1332.24(A)(3). The director also has the authority to investigate alleged violations of the video-service-authorization requirements, R.C. 1332.24(B)(1), to subpoena witnesses and order the production of documents during the investigation, R.C. 1332.24(B)(2), and to seek injunctive relief for uncured violations, R.C. 1332.24(C)(1)(a). If the director finds that a person has violated or failed to comply with the Act and the person has failed to cure the violation, the director may (1) bring an action in a court of common pleas to enjoin the person's activity, R.C. 1332.24(C)(1)(a), (2) enter into a "written assurance of voluntary compliance with the person," R.C. 1332.24(C)(1)(b), or (3) assess a civil penalty against the person pursuant to R.C. Chapter 119, R.C. 1332.24(C)(1)(c).

**{¶ 45}** The authority of local governments is far more limited. A video-service provider that offers video service in a municipal corporation or township is required to pay video-service-provider fees to the local government at the end of each calendar quarter. R.C. 1332.32(A). The percentage of gross revenue that is collectible as a fee is set forth in R.C. 1332.32(C)(1)(a) and (b), and the timing of when a local government is required to provide written notice to the video-service provider of that percentage under R.C. 1332.32(C)(1)(a) or (b) is set forth in R.C. 1332.32(C)(2). The legislature established a formula for calculating gross revenue for the preceding calendar quarter, R.C. 1332.32(A) through (B)(1)(a) through (d), and provided specific exemptions from being considered "gross revenue." R.C. 1332.32(B)(2)(a) through (h).

{¶ 46} The Act permits locals government to perform annual audits, at their own expense, to verify the "accuracy" of the video-service provider's calculation of the fees owed, R.C. 1332.33(A), and R.C. 1332.33(B) grants local governments the right to recoup any underpayment found in the audit with interest. The Act provides a specific remedy to local governments: "An action by the municipal corporation or township" may be brought in a court of competent jurisdiction to litigate "the amount of video service provider fee due based on the audit results." R.C. 1332.33(D).

{¶ 47} That is all the authority that the Act grants to local governments. The Act plainly and unambiguously denies Maple Heights statutory authority to bring an action to enforce its provisions. It grants the primary responsibility for enforcing its requirements to the director of commerce. The director is the sole franchising authority, and he or she is empowered to investigate any allegation or complaint that a video-service provider is failing to comply with the Act's requirements. At the same time, the Act removes the prior authority that had belonged to local governments—i.e., the power to regulate video-service providers and to require franchise agreements from them. It also replaces the franchise fees local governments once exacted from cable companies with a fee set by statute, and it affords local governments the limited remedy of an audit that they may seek to vindicate in court.

{¶ 48} By taking local governments' power and granting it to the director of commerce while reserving to local governments only a limited right to audit the calculation of the video-service-provider fee, the General Assembly has plainly and unambiguously denied local governments any other power to enforce the Act's requirements.

### B. The Majority Goes beyond the Statute's Text

{¶ 49} Since the majority agrees that "Maple Heights simply does not have express statutory authority to bring the underlying action to enforce the Act,"

majority opinion, ¶ 22, the analysis should end there. However, the majority does not do so and instead shows its willingness to go beyond the plain language of the Act and infer an unwritten right to bring suit.

{¶ 50} Although the majority does not formally adopt the *Cort*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26, test, it misses a prime opportunity to make clear that the factors in the *Cort* test have no relevance in Ohio. And in failing to definitively reject the *Cort* test, it creates confusion for future litigants who may be tempted to make creative arguments for causes of actions that the General Assembly has not deemed fit to create.

## II. Conclusion

{¶ 51} As today's decision shows, inferring the existence of a cause of action from a statute that does not create one is not just a matter of statutory misinterpretation. It is the work of judges who are guided by their own public-policy choices, not text. It is the very definition of judicial activism: "A philosophy of judicial decision-making whereby judges allow their personal views about public policy, among other factors, to guide their decisions, usu[ually] with the suggestion that adherents of this philosophy tend to find constitutional violations and are willing to ignore governing texts and precedents." *Black's Law Dictionary* 974 (10th Ed.2014).

{¶ 52} The majority therefore moves Ohio in the wrong direction. The General Assembly's intent, as reflected in the words of the Act, should be this court's lodestar. To give authority to local governments to enforce any provision of the Act beyond what the legislature has authorized would subvert the legislature's intent. For this reason, Maple Heights has no cause of action against Netflix or Hulu under the Act, express on implied.

{¶ 53} Consequently, I concur in the majority's answers to the certified questions of state law only and join none of its analysis or reasoning.

FISCHER and DEWINE, JJ., concur in the foregoing opinion.

_____

DiCello, Levitt & Gutzler, L.L.C., Mark A. DiCello, and Justin J. Hawal, for respondent.

Ulmer & Berne, L.L.P., Amanda Martinsek, and Gregory C. Djordjevic; and Latham & Watkins, L.L.P., Mary Rose Alexander, Robert C. Collins III, and Jean A. Pawlow, for petitioner Netflix, Inc.

Brouse McDowell and Kerri L. Keller; and Wilson, Sonsini, Goodrich & Rosati, P.C., Victor Jih, and Eric T. Kohan, for petitioner Hulu, L.L.C.

Tucker Ellis, L.L.P., and Jeffrey C. Sindelar Jr.; and Kilpatrick, Townsend & Stockton, L.L.P., and Adam H. Charnes, in support of petitioners for amicus curiae DIRECTV, L.L.C.

Public Knowledge and John Bergmayer; and Calfee, Halter & Griswold, L.L.P., James F. Lang, and Colleen M. O'Neil, in support of petitioners for amicus curiae Public Knowledge.

Calfee, Halter & Griswold, L.L.P., James F. Lang, Colleen M. O'Neil, and Madeline H. Shanahan; Steptoe & Johnson, L.L.P., Pantelis Michalopoulos, and Matthew R. Friedman; and Crosscastle, P.L.L.C., and Jared R. Butcher, in support of petitioners for amici curiae DISH Network Corp. and DISH Network, L.L.C.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, and Mathura J. Sridharan, Deputy Solicitor General, in support of petitioners for amicus curiae state of Ohio.

_____